Middleton, J.
Both the trial court and the Court of Appeals proceeded upon the theory that the only, or at least the controlling, issue raised by the pleadings was as to the existence of a conspiracy between Eobert and Luetta,.which conspiracy was designed to defraud the defendant. We can not agree with that view of the issues.
The defense urged was not the existence of a conspiracy but the perpetration of a fraud by Luetta in representing that she would testify as to relations with her father which would bring lasting disgrace upon the younger half sister, Jane, and that duress resulted. True, it is also alleged that the representations were made to Jane through the means of a conspiracy, but that does not make the existence of the conspiracy the substance of the defense. The jury, in its answer to interrogatory No. II, found that the statements which Luetta made to Eobert regarding the testimony which she would present at the trial of the will contest case were false.
It is not possible within reasonable limits to exhaustively discuss the development of the law of duress and to analyze the innumerable decisions of courts which treat of the defense of duress. Modern authorities on the subject agree that the legal conception of duress has undergone a radical change since the early period of operation of American courts. Historically, *340 the defense of duress arose, and was developed, in connection with threats of bodily harm or criminal prosecution. In the English courts, as well as in the early American courts, the threat to which the complaining party was subjected must have been of such serious character as to create fear such as would impel a person of ordinary courage to yield to it. The standard by which the gravity of the threat was measured was the effect upon the mind of a man of ordinary firmness and courage. The adoption and application of such a legal standard obviously made the defense of duress unavailable to those who for any reason did not measure up to the legal standard of firmness, courage and strength of will. By a long process of development those ancient conceptions have been modified, so that today the test as to whether duress existed is the effect produced upon the complaining individual. The courts now seek to determine whether the threats were such as to have overcome the will of the person threatened and to have created a state of mind such that he was induced to do an act which he would not otherwise have done and which he was not bound to do. The real and ultimate fact to be determined in every case is whether the party affected really had a choice; whether he had his freedom of exercising his will. Contrary to the inquiry of the early days, the courts now consider the characteristics, of the person affected, including the age, sex, state of health, mental capacity, relation of the parties and all attendant circumstances. That which would not create duress with respect to an ordinary, strong, vigorous individual may very well constitute duress with respect to an individual having less strength and vigor.
This development of the legal conception of duress carries with it another incidental change. Duress is no longer confined to situations involving threats of personal injury or imprisonment, although most of the *341 modern decisions do arise out of threats of that character. Today, according to the weight of authority, a threat of personal or family disgrace may be of such gravity as to deprive the one threatened of the mental capacity necessary to execute a valid contract.
It is also the prevailing modern view that threats which result in duress need not be conveyed directly to the one threatened. It is sufficient if the- threats were made to a third person, with the intent that the threats be conveyed to the person to be affected, or with knowledge that they would be so conveyed, and with the intent of the one making the threat to thereby procure an agreement or some other advantage from the person who was the object of the threats; that the threats were so conveyed; that they did have the intended effect ; and that the one making the threats thereby procured the agreement or other advantage desired.
This court recognized this modern view of duress in its decision in State, ex rel. Lattanner, Deputy Supt. of Banks, v. Hills, 94 Ohio St., 171, 113 N. E., 1045. In that case, a note was executed by the defendant because of threats of prosecution of his brother, which threats were not made to the one signing the note but to another brother. The second paragraph of the syllabus of that case reads:
“However, the defense of duress is available to the maker of such note, and if the execution thereof was induced solely by threats of criminal prosecution of a brother of the defendant, made for that purpose by officers of the payee bank and a representative of the state Superintendent of Banks, and under such circumstances as to constitute a reasonable and adequate cause to control the will of the maker of said note, he may be relieved from payment thereof.”
The opinion, written by Judge Matthias, contains the following paragraph:
“It further appears from the record that these rep *342 resentations and threats were communicated by Frederick P. Hills to his brother, the defendant, and there is evidence in the record that by means of such threats the defendant was coerced into signing the note, and that but for such representations and threats he would not have executed the note now sued upon. The evidence further indicates that these threats were made under such circumstances as to constitute a reasonable and adequate cause to control the will of the defendant, and that it was intended that they should be communicated to and influence the action of the defendant and induce the execution of the note. It was, therefore, competent to show that they were in fact communicated to the defendant and also to show what, if any, effect they had in inducing the defendant to sign the note.”
For exhaustive discussions of the general principles hereinabové stated reference may be made to 5 Williston on Contracts (Rev. Ed.), Chapter XLVII, 4493; 1 Page on Contracts, 779, Section 481 et seq.; 1 Story on Equity Jurisprudence, 329, Section 341 et seq.; 17 American Jurisprudence, 883, Section 11 et seq.
From the host of decisions cited in texts and digests attention may be called to the following as representative: Galusha v. Sherman, 105 Wis., 263, 81 N. W., 495, 47 L. R. A., 417; Coleman v. Crescent Insulated Wire & Cable Co., 350 Mo., 781, 168 S. W. (2d), 1060; Winget v. Rockwood, 69 F. (2d), 326; Henderson v. Plymouth Oil Co., 13 F. (2d), 932; Schultz v. Catlin, 78 Wis., 611, 47 N. W., 946; Price v. Bank of Poynette, 144 Wis., 190, 128 N. W., 895; McCarthy v. Taniska, 84 Conn., 377, 80 A., 84.
In the instant case even though conspiracy between Luetta and Robert was not proved, the evidence conclusively established that Luetta made threats that she would testify (falsely, as the jury found by its an *343 swer to interrogatory No. II) as to illicit relations between herself and her father; that no such alleged relationship between herself and her father had ever come to the knowledge of her younger half sister, Jane; and that the threats were made for the sole purpose of procuring an agreement on the part 'of Jane to pay Luetta $10,000. Although there was some ambiguity in the testimony as to Luetta’s intent that her entire story should be conveyed to Jane, it is obvious that Luetta’s desired result could not have been obtained without communication of her threats to Jane and the situation was such as to make ineffective any contention that Luetta did not intend that such communication to Jane should result. The evidence, uncontradicted, is also conclusive that for two days after Robert’s return from his conference with Luetta, Jane was continuously subjected to Robert’s repetition of the threats and was tormented and distressed by the thought of the lasting disgrace which would be suffered by Jane and her children if Luetta were not induced by payment of money to refrain from telling such story — which story the jury found to be untrue. The evidence clearly established that the two-day ordeal undergone by Jane so affected her physically and mentally as to control her will. The effect upon Jane was just what Luetta intended. Therefore, the note executed by Jane under such circumstances was procured by duress, and payment thereof can be successfully resisted.
The argument was made on behalf of the plaintiff that, at most, the note is voidable and that any consideration received by Jane must be returned if the contract is avoided and payment is refused. In our judgment, the peculiar circumstances of this case are a complete answer to this argument. Luetta did dismiss her will contest case, but in so doing she gave *344 up nothing to which she was entitled. Her case was based solely upon her threatened testimony which the jury found to be false. In dismissing the action she, therefore, did nothing more than she was morally obligated to do. Jane received nothing from Luetta which could be returned. Jane is, therefore, not es-topped to refuse payment of the note because of the dismissal of the will contest case.
Since, in our view, the answer of the defendant charged the commission of a wrong by Luetta which could be proved without establishing the alleged conspiracy and since there was, in our judgment, competent evidence of commission of the wrong, we consider the portion of the charge to the jury, hereinabove quoted, to be an incorrect statement of the applicable law. The charge so given recognizes only the existence of a conspiracy as a defense. This we consider not an error of omission but of commission.
A study of the record does not support the statement by plaintiff’s counsel, or the apparent impression of the Court of Appeals, that the defendant relied wholly upon the alleged conspiracy as a defense in her answer and on the trial and that she raised the so-called conduit theory only in the Court of Appeals, At pages 77 and 78 of the printed record counsel for the defendant, in argument with respect to the admissibility of testimony, stated his position that if two persons operate together to create a fraud the person who benefits from the fraud, agency or no agency, can not profit, if through the perpetration of the fraud he obtained the desired result (the note). Again, in connection with the motion for new trial, defense counsel asserted that Robert conveyed the information which he obtained through Luetta, regardless of whether there was conspiracy between him and Luetta and regardless of whether he knew that the information was *345 false, and that the ultimate determinative fact was whether the fraud was committed and had the effect of preventing the defendant from exercising her free will.
The charge of the court, to which we have herein-before referred and which we consider erroneous, was prejudicial to the defendant, not to the plaintiff, but the jury nevertheless rendered a general verdict for the defendant which was the verdict that it legitimately could have rendered had it been properly charged by the trial court. The plaintiff, therefore, has no sound ground upon which to challenge the jury’s verdict. Coneededly, it is the duty of the court to harmonize answers to the interrogatories with the general verdict if possible. We do not consider that the answers to the interrogatories as a whole were inconsistent with the verdict and we, therefore, hold that the trial court should not have rendered judgment for the plaintiff notwithstanding the verdict. Judgment for the defendant should have been rendered upon the jury’s verdict.
The judgment of the Court of Appeals is reversed and the cause is remanded to the Common Pleas Court for entry of judgment for the defendant on the verdict and for further proceedings according to law.

Judgment reversed.

Weygandt, C. J., Zimmerman, Stewart, Matthias and Hart, JJ., concur.
Taet, J., concurs in paragraphs one and three of the syllabus and in the judgment.